### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:24-cr-43-TMR-3 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| JAMARTAY BROWN, | : | |
| | : | |
| Defendant. | : | |

---

### ENTRY AND ORDER DENYING MOTION TO SUPPRESS AND REQUEST
### FOR HEARING (DOC. NO. 158)

---

Currently before the Court is the Motion to Suppress and Request for Hearing (the "Motion") (Doc. No. 158), filed by Defendant Jamartay Brown ("Brown"). Brown is one of eleven defendants indicted for allegedly conspiring to engage in a drug trafficking operation. (*See* Doc. No. 89 at PageID 251-52.) Through his Motion, Brown now seeks to suppress evidence against him, which was obtained by way of three search warrants, three uses of a pen register/trap and trace device, pole camera surveillance, and Brown's own statements given in the course of interrogation by law enforcement. (*See* Doc. No. 158 at PageID 562-63.) For the reasons articulated herein, the Court ultimately **DENIES** Brown's Motion.

### I.    BACKGROUND

#### A.  The Controlled Buys

Law enforcement began investigating Brown and his alleged co-conspirators in late-2023, after receiving an anonymous tip that Brown was engaged in drug trafficking. (Gov't. Ex. 7a at Page 5.) Allegedly, in or around September of 2023, a confidential informant apprised the Warren County Ohio Drug Task Force of Brown's involvement in a large-scale drug trafficking operation.

(*Id.*)

Acting on this information, law enforcement officials allegedly conducted a series of controlled drug-buys from Brown. The first of these controlled buys occurred in November 2023, when an undercover officer ("UC") met Brown at an undisclosed location in the greater Cincinnati area to purchase methamphetamine. (Gov't. Ex. 3a at Page 4.) The investigating officer testified that Brown arrived at the location in a 2013 Chrysler 300, bearing Ohio license plate number KBJ2775 and vehicle identification number 2C3CCAETZDH641164 (the "2013 Chrysler"). (*Id.* at Page 3, 5.) Brown then allegedly exited his vehicle and made his way into the passenger seat of the UC's car, where the UC gave Brown cash in exchange for a baggie of suspected drugs. (*Id.* at Page 5.) After this sale, Brown got back in the 2013 Chrysler and left. (*Id.*) Law enforcement followed Brown on his route until he returned to his home on Larkspur Drive in Dayton, Ohio. (*Id.*)

Investigators would allegedly conduct three more controlled buys from Brown or his associates in January of 2024. (*See* Gov't. Ex. 2a at Page 4-7.) In early-January, the UC again met Brown at an undisclosed location in the greater Cincinnati region. (*Id.* at Page 4.) This time, when the controlled buy was completed, officers followed Brown until he arrived at his destination of 402 West Norman Avenue, Dayton, Ohio 45406 ("Norman Ave. House"). (*Id.* at Page 5.) Officers watched Brown enter the Norman Ave. House and ended their surveillance. (*Id.*) Later testing allegedly confirmed the substance purchased from Brown to be methamphetamine. (*Id.*) In mid-January, the UC allegedly contacted Brown to make another controlled buy and was directed to meet Brown at the Norman Ave. House. (*Id.*) Once inside, the UC again allegedly met Brown and exchanged cash for a baggie of suspected drugs. (*Id.* at Page 6.) Finally, in late-January of 2024, the UC contacted Brown to make a third controlled buy, but Brown was in the

hospital after having been shot in the stomach. (*Id.*) Nevertheless, Brown allegedly arranged for the UC to purchase drugs from an associate at the Norman Ave. House. (*Id.*) The UC purportedly went to the Norman Ave. House again and exchanged cash for suspected methamphetamine. (*Id.* at Page 6-7.)

### B. The Search Warrants

Additionally, law enforcement obtained three warrants relevant to Brown's case: first, law enforcement officials received a warrant to surreptitiously install a GPS tracking device on Brown's car—the 2013 Chrysler ("Tracking Warrant") (Gov't Ex. 3b); second, a search warrant was issued for the Norman Ave. House ("Norman Ave. Warrant") (Gov't. Ex. 2b); and, third, law enforcement secured a warrant to search Brown's cell phone, having seized the phone in their warranted search of the Norman Ave. House ("Cell Phone Warrant") (Gov't. Ex. 7b).

Federal Bureau of Investigation ("FBI") Special Agent Sarah Deamron ("SA Deamron") submitted an affidavit in support of the Tracking Warrant on January 10, 2024. (*See* Gov't. Ex. 3a.) In her affidavit, SA Deamron testified to the controlled buys involving Brown in November 2023 and early-January 2024. (*Id.* at Page 4-6.) In particular, SA Deamron pointed to Brown's alleged use of the 2013 Chrysler to commute to and from these two controlled buys. (*Id.*) On January 10, 2024, upon reviewing SA Deamron's affidavit, United States Magistrate Judge Peter B. Silvain, Jr. found probable cause to believe that Brown was using the 2013 Chrysler to engage in drug trafficking and issued the Tracking Warrant. (Gov't. Ex. 3b at Page 1.)

The next warrant to issue in relation to Brown was the Norman Ave. Warrant. (*See* Gov't. Ex. 2b.) On February 6, 2024, SA Deamron submitted an affidavit in support of finding probable cause to issue the Norman Ave. Warrant. (*See* Gov't. Ex. 2a at Page 1-2.) Therein, SA Deamron testified as to the controlled buys from Brown that law enforcement had orchestrated in January

2024. (*Id.* at Page 4-7.) In particular, SA Deamron emphasized the allegation that law enforcement made two of these controlled buys at the Norman Ave. House. (*Id.* at Page 5-7.) The same day, United States Magistrate Judge Caroline H. Gentry reviewed SA Deamron's affidavit and issued the Norman Ave. Warrant. (Gov't. Ex. 2b at Page 1.)

The FBI and other law enforcement officials carried out the Norman Ave. Warrant the following day, on February 7, 2024. (Gov't. Ex. 7a at Page 5.) When execution of the Norman Ave. Warrant was initiated, officers allegedly saw Brown exit the Norman Ave. House and attempt to flee. (*Id.* at Page 6.) However, Brown was apprehended and taken into police custody. (Doc. No. 229 at PageID 904.) Brown was then transported to the Montgomery County Sheriff's Office headquarters and placed in an interrogation room. (*Id.*) FBI Special Agent Robert Buzzard ("SA Buzzard") and SA Deamron joined Brown in the interrogation room shortly after. (*Id.* at PageID 905.) The officers introduced themselves and asked Brown several preliminary identifying questions. (*Id.*) At Brown's suppression hearing, SA Buzzard testified that Brown appeared to be sober, responsive, and capable of fully understanding what was being said to him. (*Id.* at PageID 905-06.) At that point, SA Buzzard advised Brown of his *Miranda* rights. (*Id.* at PageID 906; *see also* Gov't. Ex. A.) Brown indicated that he understood his rights and agreed to speak with SAs Buzzard and Deamron anyway. (Doc. No. 229 at PageID 906-07.) Brown did not waive his rights in writing, but his interrogation was video and audio recorded, and entered into evidence as Government Exhibit 1.

Subsequently, SA Deamron sought to obtain the Cell Phone Warrant. (*See* Gov't. Ex. 7a.) For probable cause, SA Deamron testified that Brown was witnessed with his cell phone in-hand as he attempted to flee authorities during execution of the Norman Ave. Warrant. (*Id.* at Page 6.) Further, SA Deamron spoke of the controlled buys from Brown, which the UC allegedly arranged

by contacting Brown's cell phone. (*Id.* at Page 7.) On February 21, 2024, Magistrate Judge Gentry determined that there was probable cause to search Brown's cell phone and issued the Cell Phone Warrant. (Gov't. Ex. 7b at Page 1.)

### C. Pen Registers

Over the course of law enforcement's investigation into Brown, the Government also obtained three authorizations to install pen register and trap and trace devices ("Pen Register Device(s)") on a cell phone presumably used by Brown. (*See* Gov't. Exs. 4b, 5b, 6b.) The Government sought authorization to install these Pen Register Devices pursuant to 18 U.S.C. § 3122(a). (*See* Gov't. Exs. 4a, 5a, 6a.) For context, Pen Register Devices capture electronic information transmitted by a cell phone, save for the contents of the cell phone user's communications. 18 U.S.C. § 3127(3) & (4). In the simplest of terms, a Pen Register Device serves to identify a cell phone user and who that user is contacting with his device.

### D. Pole Camera Surveillance

The final investigative effort to speak of with respect to Brown's Motion involves the installation of a pole camera by law enforcement. After interviewing Brown, law enforcement affixed a camera to a utility pole on Stuben Avenue in Dayton, Ohio. (Doc. No. 229 at PageID 913.) That camera looked directly across the street to a property located at 1241 Stuben Avenue. (*Id.* at PageID 913-14.) Brown did not live at this address and, in the 43 days that the pole camera remained up, Brown was seen at the property one time. (*Id.* at PageID 920.)

### E. Procedural History

On April 30, 2024, a federal grand jury returned an indictment against Brown and eight other alleged co-conspirators for a series of crimes best characterized as participating in a drug trafficking operation. (Doc. No. 12.) On May 28, 2024, the grand jury returned the First

Superseding Indictment, adding two alleged co-conspirators to this case.  (Doc. No. 89.)  For his part, in addition to being charged with conspiracy, Brown has been charged with eleven counts related to the trafficking of controlled substances and one count for being a felon in possession of a firearm.  (*Id.* at PageID 252-57.)

Brown filed his instant Motion on December 13, 2024.  (Doc. No. 158.)  The Court held a suppression hearing regarding Brown's Motion on May 1, 2025, and set a briefing schedule so the Parties might have an opportunity to conform their arguments to the evidence presented.  (*See* Doc. No. 223.)  Brown then filed his Memorandum in Support of Motion to Suppress as to Branch I on June 16, 2025 (Doc. No. 245), and the Government submitted its response in opposition to Brown's Motion on July 7, 2025 (Doc. No. 266).  Brown did not file a reply.  Thus, Brown's Motion is now ripe for review and decision.

## II.  <u>ANALYSIS</u>

A criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court.  Fed. R. Crim. P. 12(b)(3)(C).  "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression."  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).

Brown argues for the suppression of evidence in this case according to six specific branches.  (Doc. No. 158 at PageID 562-63.)  However, these six branches can be separated into four broader categories.  In Branches II, III, and VI of his Motion, Brown challenges the three search warrants issued in this matter.  (*Id.*)  In Branch IV of his Motion, Brown takes issue with law enforcement's use of Pen Register Devices to investigate him.  (*Id.*)  In Branch V, Brown argues that the use of a pole camera to surveil a house on Stuben Avenue, in Dayton, Ohio, ran afoul of the Fourth Amendment.  (*Id.*)  Finally, in Branch I of his Motion, Brown seeks to suppress statements he made when being interviewed by SA Buzzard on February 7, 2024, because he did

6

not knowingly and voluntarily waive his *Miranda* rights before speaking. (*Id.*) The Court considers each broad category of Brown's Motion accordingly.

## A.  Branches II, III, & VI – The Search Warrants

At bottom, the Fourth Amendment of the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.  Under the Fourth Amendment, law enforcement may generally not conduct a search before obtaining "a warrant from a neutral and disinterested magistrate." *Franks v. Delaware*, 438 U.S. 154, 164 (1978).  To this end, it is expected that a magistrate will not issue a search warrant without a showing of probable cause to justify the requested search.  *U.S. v. Abboud*, 438 F.3d 554, 569 (6th Cir. 2006) ("Only if the magistrate finds probable cause can she issue a search warrant").  Altogether, the Fourth Amendment protects against unreasonable searches and seizures by "'requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'"  *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)) (alterations in original).

When applying for a search warrant, the government necessarily bears the burden of establishing probable cause.  *Abboud*, 438 F.3d at 569 (citing Fed. R. Crim. P. 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)).  To meet its burden, the government is expected to offer an affidavit containing "facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search.'"  *U.S. v. Frazier*, 423 F.3d 526, 531 (6th Cir.

2005) (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). The government need not possess evidence that would secure a conviction beyond a reasonable doubt. *Wong Sun v. U.S.*, 371 U.S. 471, 479 (1963). Rather, "probable cause is a fluid concept" inherently tied to "an assessment of probabilities" and based on variable and particularized facts. *Gates*, 462 U.S. at 231.

Magistrate judges reviewing an affidavit for probable cause must draw from the totality-of-the-circumstances presented in the government's affidavit. *Id.*; *see also Wong Sun*, 371 U.S. at 479 (probable cause "must be measured by the facts of the particular case"). By the totality of the circumstances, a magistrate's probable cause determination will generally stand when she had a substantial basis for concluding that the search would turn up evidence of criminality. *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). In the end, whatever lies within the four corners of the government's affidavit will dictate whether a magistrate had a substantial basis for her probable cause determination. *U.S. v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)). Moreover, a magistrate judge's probable cause determination should most often "be paid great deference." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

With certain exceptions, any evidence obtained as a result of an unlawful search cannot be used as evidence against the victim of the search. *Wong Sun*, 371 U.S. at 484 (citing *Weeks v. United States*, 232 U.S. 383 (1914)). Yet, this exclusionary rule is not enshrined in the Fourth Amendment. *U.S. v. Leon*, 468 U.S. 897, 906 (1984). Instead, the exclusionary rule is "'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect ....'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

### i.     Norman Ave. Warrant

Regarding the search warrants challenged by Brown in this case, the Court turns first to the Norman Ave. Warrant. Brown simply claims that the affidavit in support of issuing the Norman Ave. Warrant was "insufficient for probable cause." (Doc. No. 158 at PageID 567.) The Court finds this assertion to be unavailing.

Paying due deference to Magistrate Judge Gentry's finding of probable cause, the Court finds that the Government provided the Magistrate Judge with a substantial basis for probable cause to issue the Norman Ave. Warrant. As stated above, when applying for the Norman Ave. Warrant, SA Deamron testified that law enforcement followed Brown to the Norman Ave. House immediately after allegedly conducting a controlled drug buy. What is more, SA Deamron also described two more alleged controlled buys that actually occurred at the Norman Ave. House over the course of a month. Indeed, SA Deamron testified that testing revealed at least one of the substances allegedly purchased from Brown to be methamphetamine. In other words, SA Deamron described for Magistrate Judge Gentry a scenario where a supposed drug dealer was gravitating to the Norman Ave. House specifically and, at least in some instances, conducting his illicit business out of the Norman Ave. House. When viewing these allegations together, the Court thinks it well-founded to believe that the Norman Ave. Warrant was substantially likely to yield evidence of criminal activity. Accordingly, any evidence obtained as a result of the Norman Ave. Warrant shall not be suppressed here.

### ii.     Tracking Warrant

Upon review, the Court similarly finds that Magistrate Judge Silvain had a substantial basis for his probable cause determination with respect to the Tracking Warrant. In challenging the issuance of the Tracking Warrant, Brown merely asserts that the Tracking Warrant "application

was insufficient for probable cause." (Doc. No. 158 at PageID 568.) However, SA Deamron's affidavit in support of probable cause for the Tracking Warrant clearly points to Brown's alleged use of the same vehicle—the 2013 Chrysler—to travel to and from two controlled drug buys. This gives way to the natural inference that Brown was using the 2013 Chrysler, not only as a personal vehicle, but as an instrument of Brown's alleged drug trafficking enterprise. The Court then finds that SA Deamron's affidavit offered a substantial basis for finding probable cause to track the 2013 Chrysler's movements. Therefore, any evidence derived from the Tracking Warrant here shall not be suppressed.

### iii. Cell Phone Warrant

As a last word on the search warrants at play, the Court finds that the Cell Phone Warrant in this matter was properly issued. On this point, Brown contends that SA Deamron's affidavit in support of probable cause for the Cell Phone Warrant was insufficient. (Doc. No. 158 at PageID 570-71.) Specifically, Brown asserts that SA Deamron's affidavit did not connect Brown's cell phone to drug activity, but instead relied on boilerplate language concerning how drug traffickers utilize cell phones. (*Id.*) As a point of order, the Court would simply opine that boilerplate language usually becomes boilerplate in the first place because it is reliable and consistent. But at any rate, SA Deamron's affidavit did not simply regurgitate such boilerplate language. Instead, SA Deamron's affidavit alleged that Brown was seen placing his cell phone in his pocket as he tried to flee the Norman Ave. House. More importantly, the affidavit alleged that all of the controlled drug buys in the investigation into Brown were initiated by contacting Brown on his cell phone. When these facts are paired with the boilerplate language about how drug traffickers use cell phones, the Court finds it entirely probable that evidence of criminality would be found

10

on Brown's phone.  Consequently, any evidence adduced from the execution of the Cell Phone Warrant shall not be suppressed.

### B.  **Branch IV – Pen Register Devices**

Moving on, the Court further rejects Brown's challenge to the use of Pen Register Devices to investigate him.  To start, Brown refers to these Pen Register Devices as wiretaps.  (Doc. No. 158 at PageID 568-69.)  As previously illustrated herein, a Pen Register Device is not the same as a wiretap.  With this in mind, Brown's arguments to suppress evidence obtained by using Pen Register Devices are largely, if not entirely, inapplicable.

Nevertheless, when the Government applies to use a Pen Register Device, the official submitting the application must identify themselves and the applicant—usually a Government attorney—must certify that "information likely to be obtained" by the Pen Register Device "is relevant to an ongoing criminal investigation …."  18 U.S.C. § 3122(b).  In this case, it appears that the Government's applications for Pen Register Devices to investigate Brown complied with these basic requirements.

Yet, even if this were not so, "the exclusionary rule is not an available remedy for a statutory violation unless the Constitution requires it or the statute expressly provides for it." *United States v. Powell*, 847 F.3d 760, 771 (6th Cir. 2017) (citations omitted).  Here, Brown offers no substantive argument that the use of Pen Register Devices to investigate him violated the Constitution.  He only states that the use Pen Register Devices was authorized without probable cause, which is not required to authorize the use of Pen Register Devices to begin with.  (Doc. No. 158 at PageID 569.)  Thus, any evidence derived from the use of Pen Register Devices in this matter shall not be suppressed.

C.  **Branch V – Pole Camera Surveillance**

For the purposes of considering Brown's Motion, the Court assumes *arguendo* that Brown has standing to challenge the use of pole camera surveillance on Stuben Avenue, in Dayton, Ohio, because Brown was seen by the camera, even if only once.  Still, the Court finds Brown's objection to the use of pole camera surveillance to be lacking.

Because pole camera surveillance does not constitute an actual physical intrusion by the government, whether the use of a pole camera violates the Fourth Amendment is dependent upon whether the defendant had a reasonable expectation of privacy in the areas that the pole camera was able to capture.  *See United States v. May-Shaw*, 955 F.3d 563, 567 (6th Cir. 2020).  A defendant will not have such a reasonable expectation of privacy if the pole camera can only observe what the defendant "made public to any person travelling on the roads surrounding his home."  *Id.* (citing *United States v. Houston*, 813 F.3d 282, 288 (6th Cir. 2016)) (internal quotation marks omitted).

Brown cannot demonstrate a reasonable expectation of privacy to suppress the pole camera footage at issue.  The pole camera certainly did not view any part of 1241 Stuben Avenue that was not visible to any member of the public passing by.  To be sure, at Brown's suppression hearing, SA Buzzard explicitly testified that the pole camera could see no more than the front of the residence and surrounding street-facing curtilage.  (Doc. No. 229 at PageID 913-14.)  As such, even assuming that he has standing, Brown's challenge to the use of pole camera surveillance here fails.

D.  **Branch I – Brown's Statements to Law Enforcement**

Finally, the Court has determined to deny Brown's Motion insofar as he seeks to suppress his statements made to law enforcement when being interviewed on February 7, 2024.  For this

issue, Brown argues that, although he was advised on his *Miranda* rights, Brown did not knowingly and voluntarily waive those rights. (Doc. No. 245 at PageID 1162-63.)

As a general rule, "statements made during a defendant's 'custodial interrogation' must be suppressed unless authorities advise[d] the defendant of his or her rights." *U.S. v. Diaz*, 179 F. App'x. 938, 943-44 (6th Cir. 2006) (citing *Miranda v. Arizona*, 384 U.S. 436, 476 (1966)). Fundamentally, the Constitution preserves the right against self-incrimination and the right to have the assistance of counsel for defense against prosecution. U.S. CONST. AMEND. V (right against self-incrimination); U.S. CONST. AMEND. VI (right to assistance of counsel). In *Miranda*, the Supreme Court established a prophylactic rule for protecting these constitutional rights. 384 U.S. at 467-71. That rule requires law enforcement officers to advise suspects-in-custody of their rights under the Fifth and Sixth amendments before subjecting the suspect to interrogation. *Id.*

After receiving his *Miranda* warnings, a suspect may choose to waive his constitutional rights and speak with the interrogating officer(s). *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). To be valid, the suspect's waiver must be made knowingly and voluntarily. *Id.* Whether a defendant's waiver of his *Miranda* rights was knowing and voluntary will be drawn from "the particular facts and circumstances surrounding [the] case." *Id.* at 374 (internal citations and quotation marks omitted). For instance, the Sixth Circuit has held that "a *Miranda* 'waiver may be clearly inferred … when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights' and speaks." *U.S. v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (quoting *United States v. Nichols*, 512 F.3d 789, 798-99 (6th Cir. 2008)).

On the instant record, the Court can only find that Brown knowingly and voluntarily waived his *Miranda* rights by speaking to SAs Buzzard and Deamron. SA Buzzard testified that

he advised Brown of his rights and Brown clearly indicated that he understood those rights. (Doc. No. 229 at PageID 906.) Moreover, Brown demonstrated that he was familiar with his rights when he told his interviewers that he would typically ask for an attorney under such circumstances. (*Id.* at PageID 911.) In this circumstance, however, he proceeded to speak with SAs Buzzard and Deamron anyway. In short, Brown just waived his rights that day. That Brown did not waive his *Miranda* rights in writing is irrelevant. *Adams*, 583 F.3d at 467 (citing *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002)) ("Thus, a waiver of *Miranda* rights need not be made in writing and need not be expressly made"). Brown's interview was audio and video recorded and entered into evidence for anyone who cares to press play. Hence, Brown's statements made in the course of custodial interrogation shall not be suppressed in this case.

### III.   CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Brown's Motion to Suppress and Request for Hearing (Doc. No. 158) in all respects.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, July 24, 2025.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE